# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROBERT H. HALE, | |
| *Plaintiff*, | |
| v. | Civil Action No. 13-1390 (RDM) |
| UNITED STATES OF AMERICA, | |
| *Defendant*. | |

## MEMORANDUM OPINION AND ORDER

This civil action for damages arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* Plaintiff Robert Hale is suing the United States for a workplace injury that he sustained while performing repairs at a U.S. Department of the Navy building. At the time of the accident, Plaintiff was employed by EMCOR Government Services ("EMCOR"), a subcontractor for the Navy. The Court held a four-day bench trial, which concluded on February 27, 2019. The parties completed post-trial briefing on June 6, 2019. For the reasons set forth below, the Court concludes that Plaintiff is barred from recovery because he was contributorily negligent.

## I. BACKGROUND

Plaintiff Robert Hale was formerly employed by EMCOR, a Navy subcontractor, as a heating and air-conditioning mechanic. On May 12, 2011, Plaintiff received an emergency "ticket" to repair the heating, ventilation, and air conditioning ("HVAC") unit in Building 220 at the Washington Navy Yard. The unit was located above a drop ceiling between floors one and two. To access the unit's controls compartment, Plaintiff climbed up a ladder and crawled into a dark space along a narrow, wooden plank. When Plaintiff reached the end of the plank, he stood

up, hitting his head on conduit.  He lost his balance and fell forwards through the drop ceiling.  As a result of his twelve-foot fall, Plaintiff fractured his wrist in multiple places.  He alleges that the effects of this injury persist to this day.  *See* Dkt. 1 at 2 (Compl. ¶ 9).

This Court held a four-day bench trial, which concluded on February 27, 2019.  Plaintiff principally argued at trial and in his post-trial briefing that, because the worksite at Building 220 failed to comply with various Occupational Safety Health Administration ("OSHA") regulations, the Navy was negligent *per se*.  Dkt. 90 at 4–9.  Defendant counters that the Navy does not owe Plaintiff a duty (beyond that of an ordinary landowner), Dkt. 98-1 at 17, 24–25, and that, in any event, Plaintiff is barred from recovery because he (1) was contributorily negligent and (2) assumed the risk of falling, *id.* at 3–16.  Although the parties' post-trial briefing raises various factual and legal issues, including the scope of the Navy's duty to Plaintiff and the degree to which Plaintiff's wrist is permanently impaired, the Court need not resolve these issues here.  Rather, the case turns on whether Plaintiff was contributorily negligent, and, if so, whether his contributory negligence bars his recovery as a matter of law.  The Court concludes that it does.  The Court will, accordingly, find in favor of the United States.

**A.      Procedural Background**

Plaintiff filed suit against the United States on September 12, 2013.  The United States, in turn, filed a third-party complaint against EMCOR on April 25, 2016.  Dkt. 31 (3d Party Compl.).  At the joint request of the United States and EMCOR, the Court dismissed the third-party complaint without prejudice on July 14, 2017.  Dkt. 52 (Joint Stip. of Dismissal).  Plaintiff and the United States engaged in settlement discussions and initially reported to the Court that they had "reached a settlement in principle."  Dkt. 61 at 1.  At a subsequent status conference, however, the parties disagreed about whether they had reached a binding settlement, and they

asked that the Court resolve that dispute. *See* Oct. 10 2018 Hrg. Tr. (Rough at 2–3, 4–7). Because FTCA cases are tried to the bench, the Court suggested referring the parties' dispute regarding settlement to a magistrate judge, who could hear from the parties regarding the details of the putative settlement and could decide whether the parties' agreement "in principle" was binding. *Id.* (Rough at 14). After the parties declined to consent to referring that limited portion of the case to a magistrate judge, the Court determined that it should, first, hear the evidence and decide the case as the trier of fact and, then, if necessary, decide whether the parties had entered into a binding settlement agreement. Minute Order (Oct. 10, 2018). Although that approach is far from efficient, the Court concluded that neither aspect of the parties' dispute was necessarily antecedent to the other and that it was appropriate to proceed in this order to avoid any appearance that the parties' settlement discussions influenced the Court's factfinding.

At trial, Plaintiff testified in support of his FTCA claim, and he called the following additional witnesses: Elvin ("Buddy") Luskey (his supervisor at EMCOR), Dr. Richard Barth (an expert in orthopedic surgery with a specialty in hand and upper extremity), and Terry Lane (an expert on OSHA worksite safety). The government, in turn, called Robert Goodwin (the site manager of Navy Yard at the time of the accident), Jonathan Dobry (the maintenance manager), James Waite (a contracting officer with the Naval Facilities Engineering Command), and Eugenia Kennedy (an expert on OSHA worksite safety). The parties jointly called James Watts, who was, at the time of the accident, a public works officer at the Naval Air Station. Both parties also offered into evidence, *inter alia*, photographs and floor plans of Building 220, Def. Exs. 4A–C, Plaintiff's sketch of the mezzanine area where the HVAC unit was located, Joint Ex. 11B, and the accident report prepared by EMCOR, Pl. Ex. 4. Having considered the evidence

and testimony presented at trial and the parties' post-trial submissions,[1] the Court will make the following findings of fact and conclusions of law:

## B.     Factual Background

Plaintiff is a 49-year-old steamfitter (in layman's terms, someone who installs or repairs HVAC systems).  Dkt. 85 at 39, 97 (Trial Tr.).  He was hired by EMCOR in 2009.  *Id.* at 41 (Trial Tr.).  At the time, EMCOR held a contract with the Navy to perform repairs and general maintenance of the mechanical equipment in all of the buildings at the Washington Navy Yard. *Id.* at 51 (Trial Tr.).  As a journeyman steamfitter for EMCOR, Plaintiff's job entailed servicing and maintaining all of the HVAC equipment for approximately forty buildings.  *Id.* at 38 (Trial Tr.).

### 1.     *Plaintiff's Training*

Plaintiff began his career as a steamfitter in 2003 and, over the next five years, completed an apprenticeship with the Steamfitters Local 602.  *Id.* at 38–39 (Trial Tr.).  In 2009, Plaintiff was certified as a journeyman steamfitter, *id.*, and he also received a certificate in OSHA safety compliance, (Joint Ex. 11D).  After Plaintiff joined EMCOR in 2009, he continued to receive safety training.  Plaintiff attended employee safety orientation, *see* Def. Ex. 4G, and was required to attend weekly sessions on workplace safety, *see* Dkt. 77 at 110 (Trial Tr.); Dkt. 85 at 46–47 (Trial Tr.).  Those weekly sessions covered topics such as fall protection, OSHA Top Ten Standards, and the importance of creating a pre-task plan.  *See* Joint Ex. 11F.

---

[1]  Among other things, the Court considered the testimony and evidence offered at trial, *see* Dkts. 77, 78, 81, 82, 83, 84, 85, 86, 87, 88; Plaintiff's proposed findings of fact, Dkt. 97, and conclusions of law, Dkt. 90; Defendant's proposed findings of fact and conclusions of law, Dkt. 98; and Defendant's reply to Plaintiff's proposed findings of fact, Dkt. 99.

2.    *Building 220 Worksite*

The HVAC unit in Building 220 was located on the mezzanine level of the building

(between floors one and two) above the kitchen area.  Dkt. 85 at 56 (Trial Tr.); *see also* Def. Ex.

4C (Photo of Kitchen and Mezzanine Stairs).  To access the room containing the HVAC unit,

Plaintiff had to ascend a portion of a flight of stairs and then climb a ladder that rose above the

stairs.  *See* Dkt. 85 at 56 (Trial Tr.).  The top of the ladder came up to the base of a door, which

opened outwards, leading into the mezzanine.  Def. Ex. 4A (Photo of Mezzanine Entrance).

Photographs of the stairs and ladder are reproduced below:

    

**Def. Ex. 4C**                            **Def. Ex. 4A**
**(Photo of Kitchen and Mezzanine Stairs)**        **(Photo of Mezzanine Entrance)**

Inside the mezzanine—between six and twenty inches from the door[2]—was the HVAC unit, which was eight feet wide, four feet tall, and four or five feet deep. Dkt. 85 at 61–2 (Trial Tr.). The unit sat on top of steel beams above the drop ceiling. *See id.* at 71 (Trial Tr.). The eight-foot side of the unit was facing the door, and the controls compartment was located on the opposite side. *Id.* at 61–62 (Trial Tr.). The space between the wall and the unit was covered with concrete. *Id.* at 62 (Trial Tr.). Along the right side of the unit (as one approached from the mezzanine door) was a four-foot wide by eight-foot long wooden plank,[3] which sat on top of the steel beams. *Id.* at 62, 64 (Trial Tr.). This was the only pathway to access the controls compartment on the back side of the unit. Joint Ex. 11B (Plaintiff Sketch). The plywood pathway was partially obstructed at the half-way point by ductwork protruding across the pathway, "a couple feet" off the ground. Dkt. 85 at 65 (Trial Tr.). At the end of the wooden plank was a metal catwalk, which abutted, and ran parallel to, the back side of the unit. Dkt. 78 at 23–24 (Trial Tr.). There was also a plywood platform along the back side of the unit. Joint Ex. 11B (Plaintiff Sketch). A diagram of the area, drawn by Plaintiff at his deposition, is included below:

---

[2] Plaintiff testified that the distance between the wall and the unit was between six and eight inches. *See* Dkt. 85 at 60 (Trial Tr.). His supervisor, Luskey, testified that it was "[m]aybe 18 to 20 inches." Dkt. 78 at 22 (Trial Tr.). For purposes of this opinion, this difference is immaterial.

[3] Luskey testified that what Plaintiff described as a four-by-eight plank was two, two-by-twelve boards placed together. *See* Dkt. 78 at 25 (Trial Tr.).



**Joint Ex. 11B (Plaintiff Sketch)**

Significantly, the Court finds that, at the time of Plaintiff's accident, the area was unilluminated, except for the ambient light coming through the mezzanine door. *See* Dkt. 85 at 63 (Trial Tr.). In addition, there were no barriers or tie-off points around the wooden plank or catwalk. Dkt. 78 at 103 (Trial Tr.). As a result, there was nothing to prevent someone—like Plaintiff—from accidentally falling off the wooden plank or metal catwalk and plunging through the drop ceiling into the kitchen area below.

3. *May 12, 2011 Accident*

On May 12, 2011, Plaintiff received an emergency "ticket" for Building 220. Dkt. 85 at 54 (Trial Tr.). The ticket stated that the air blowing from Building 220's HVAC unit was too

cold. *Id.* at 55 (Trial Tr.). Pursuant to EMCOR policy, emergency tickets required a response

within one hour, and the work had to be completed by the end of the day. *Id.* at 44, 70 (Trial

Tr.). Prior to this service call, Plaintiff had never before serviced the HVAC unit in Building

220, nor was he familiar with the building. *Id.* at 55 (Trial Tr.).

Plaintiff testified that he arrived at Building 220 with his "basic hand tools": a "six-in-one

screwdriver, Channellock's, and a crescent wrench." *Id.* at 56 (Trial Tr.). He left the remainder

of the tools that EMCOR had provided him in his work van, including more hand tools, "a

vacuum pump, gauges," and safety equipment, such as "a hard hat, safety gloves, . . . [and] an

emergency vest." *See id.* at 45 (Trial Tr.). Plaintiff admitted, moreover, that he did not have a

flashlight either on him or in the van because he had "left it at home." Dkt. 77 at 74 (Trial Tr.).

He also testified that he was not carrying "fall protection"—that is, a safety harness and

lanyard—because it was not a part of his regular toolkit and had to be checked out from the

EMCOR warehouse. Dkt. 85 at 47–48 (Trial Tr.).

To access the HVAC unit in Building 220, Plaintiff went up the stairs next to the kitchen

area and climbed the ladder that led to the mezzanine door. *Id.* at 56 (Trial Tr.). In order to open

the door, which swung outwards, Plaintiff had to lean back, away from the ladder. *Id.* at 60

(Trial Tr.). Once the door was open, Plaintiff could see the HVAC unit inside the mezzanine.

*Id.* at 23 (Trial Tr.). He testified that he could not see, however, any overhead lights or even

light switches. *Id.* at 63 (Trial Tr.). His only light source was the ambient light through the

mezzanine door. *Id*. Plaintiff stepped through the door onto a platform. *Id.* at 62 (Trial Tr.).

The eight-foot side of the unit was directly in front of him. *Id.* at 61 (Trial Tr.). Upon observing

the unit, Plaintiff deduced that the controls compartment was located on the opposite side of the

unit because the fan section was on the side facing him. *Id.* at 64 (Trial Tr.).

To reach the back side of the unit, Plaintiff first "shimmied" sideways along the eight-foot side of the unit with his back against the unit and his body wedged between the unit and the wall. *Id.* at 62 (Trial Tr.). Plaintiff testified that he thought the ground beneath him was concrete. *Id.* When he reached the right corner of the unit, he saw a plywood pathway running along the right side of the unit, further into the mezzanine area. *Id.* He walked down the pathway, which was four feet wide. *Id.* at 64 (Trial Tr.). As he ventured further into the mezzanine area, and away from the door, the lighting grew dimmer. *Id.* at 72 (Trial Tr.). Plaintiff testified that, at this point, he noticed the pathway did not have any railings, physical barriers, markers, or demarcated edges. *Id.* at 65–66 (Trial Tr.). He further observed that the path was partially obstructed by ductwork that protruded from the middle of the HVAC unit, a few feet off the ground. *Id.* at 65 (Trial Tr.). Plaintiff admitted that, upon observing these conditions, he probably should have called his supervisor. Dkt. 77 at 105–06 (Trial Tr.). He did not and, instead, ventured forward.

When Plaintiff reached the ductwork, he realized that it was too high to step over, so he crawled under it. Dkt. 85 at 65 (Trial Tr.). After he cleared the ductwork, Plaintiff stood up, striking his head on conduit that was hanging overhead. *Id.* at 66 (Trial Tr.). The blow caused him to lose his balance. *Id.* He misstepped, falling forward over the edge of the metal catwalk that abutted the wooden plank. *Id.* Plaintiff fell twelve feet through the drop ceiling and landed on top of a pile of carpet tiles in the kitchen. *Id.* at 67, 98 (Trial Tr.). The time was approximately 11:00 a.m. Joint Ex. 16 at 6 (Kennedy Expert Rpt.). Only two minutes had elapsed since Plaintiff entered the mezzanine. Dkt. 85 at 68 (Trial Tr.).

4. *Aftermath*

Plaintiff was transported to Howard University Hospital by ambulance. *Id.* at 68 (Trial Tr.). The doctors in the emergency room set Plaintiff's right wrist, which was fractured in multiple places, and determined, from his x-rays, that he needed surgery. *Id.* at 73 (Trial Tr.). Plaintiff underwent surgery on May 18, 2011. *Id.* at 75 (Trial Tr.). As a result of his injury, Plaintiff missed work from May 13, 2011 to June 10, 2011. *See* Pl. Ex. 19 (EMCOR's Statement of Pl.'s Lost Earnings). Plaintiff's expert, Dr. Barth, moreover, estimates that he still has a "disability rating" of "three percent to [his] right upper extremity." Dkt. 77 at 34 (Trial Tr.).

After the incident, a "Supervisor Investigation Report" was filed on May 13, 2019. *See* Pl. Ex. 3 (Supervisor Invest. Rpt.). That report, which bore the signature of "Buddy Lusky," and which was approved by "Jon Dobry," stated that the cause of Plaintiff's fall was that he was "unable to see the conduit that was behind the ductwork[,] and[,] when he hit his head[,] the impact caused him to l[o]se his balance and fall." *Id.* At trial, however, Luskey denied having written or signed the report. *See* Dkt. 78 at 56–57 (Trial Tr.) (explaining that he signed everything "Luskey, III," not "Buddy Lusky"). He testified that Jon Dobry, EMCOR's maintenance manager at the time, signed his name. *Id.* Later, Dobry acknowledged that Luskey took no part in completing the form because he was "not available." Dkt. 87 at 82 (Trial Tr.). Dobry further testified that the form was, in fact, completed by ECMOR's safety technician, Dave Smith, who investigated the fall. *See id.* at 82–83 (Trial Tr.).

In Luskey's view, there was no reason to write Plaintiff up for his conduct. He testified: "[Plaintiff] was in a bad situation. I mean, it could have happened to anybody." Dkt. 78 at 43 (Trial Tr.). The Navy Public Works Officer also conducted a preliminary mishap review and filed a report. *See* Pl. Ex. 2 (Memo re Prelim. Mishap Review). According to that report, the

"primary causal factors" of Plaintiff's fall were (1) "[i]nadequate walking space, lighting[,] and no tie off points," and (2) "[l]ack of knowledge of surroundings." *Id.* at 1 (Memo re Prelim. Mishap Review). The report recommended the following action: "[E]mployee will be retrained prior to returning to work." *Id.* Luskey testified that Plaintiff was not disciplined for the incident. Dkt. 78 at 43 (Trial Tr.).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Because this case arises under the FTCA, D.C. substantive law applies. *See Richards v. United States*, 369 U.S. 1, 2–3 (1962). That choice of law rule makes a significant difference here, because the District is one of the few jurisdictions in the United States that still recognizes the contributory negligence defense. As a general rule, this defense bars a plaintiff from recovering in negligence if "the plaintiff failed to exercise reasonable care" and that "failure was a substantial factor in causing the alleged damage or injury." *Massengale v. Pitts*, 737 A.2d 1029, 1031 (D.C. 1999). The defense, however, admits of exceptions. *See Martin v. George Hyman Constr. Co.*, 395 A.2d 63, 69–70 (D.C. 1978). Accordingly, to resolve this case, the Court must first decide whether Plaintiff failed to exercise reasonable care and whether any such failure was a substantial factor leading to his fall and injury. If so, the Court must go on to decide whether the contributory negligence defense bars his recovery or whether an exception to the defense applies in this context.

As explained below, the Court first finds that Plaintiff was negligent because, among other things, he failed to carry a flashlight, which contributed to his fall. The Court further concludes, moreover, that Plaintiff's contention that the contributory negligence defense is unavailable here because the Navy violated various OSHA regulations fails as a matter of law.

As a result, Plaintiff is barred from recovering damages against the United States under D.C. law, regardless of whether—and to what degree—the Navy was negligent.[4]

## A.    Plaintiff's Negligence Contributed to His Fall

The District of Columbia follows the Restatement (Second) of Torts' definition of contributory negligence. *Harrison v. United States*, 2018 WL 4680204, at *4 (D.D.C. Sept. 28, 2018) (citing *District of Columbia v. Brown*, 589 A.2d 384, 388 (D.C. 1991)). The Restatement defines contributory negligence as "conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm." Restatement (Second) of Torts § 463 (1965). This conduct can take one of two forms: (a) "an intentional and unreasonable exposure of himself to danger created by the defendant's negligence, of which danger the plaintiff knows or has reason to know, or (b) conduct which, in respects other than those stated in Clause (a), falls short of the standard to which the reasonable man should conform in order to protect himself from harm." *Id.* § 466. To successfully invoke the contributory negligence defense, the defendant must "'establish, by a preponderance of the evidence, that the plaintiff failed to exercise reasonable care' . . . and that this failure was a substantial factor in causing the alleged damage or injury." *Massengale*, 737 A.2d at 1031 (citation omitted).

The Court finds that Plaintiff's conduct on May 12, 2011, fell "below the standard to which he should [have] conform[ed] for his own protection," Restatement (Second) of Torts § 463 (1965), and that his negligence constituted a "substantial factor," *Massengale*, 737 A.2d at

---

[4]  The Court need not—and, indeed, does not—make any findings of fact or conclusions of law with respect to the Navy's liability.

1031, in causing his fall.  Plaintiff testified that he was not wearing a hard hat, nor was he

carrying fall protection or a flashlight in the mezzanine space.[5]  *See* Dkt. 77 at 73–74 (Trial Tr.)

(no flashlight); Dkt. 85 at 45 (Trial Tr.) (no hard hat); *id.* at 47–48 (Trial Tr.) (no fall protection).

Plaintiff further admitted that, at multiple points, he "probably" should have called his

supervisor, but did not do so.  *See* Dkt. 77 at 105–06 (Trial Tr.).  Plaintiff ultimately conceded

that he should have reported the conditions to his supervisor instead of proceeding with the job:

> Q.     So you are saying you had absolutely no option you to do [the job] no
>        matter what?
>
> A.     No.
>
> Q.     So what could you have done?
>
> A.     Well, I guess we could have tried to assess a better situation.
>
> Q.     How would you do that?  You would call your supervisor in order to
>        do that, correct?
>
> A.     Uh-hmm, sure.

*Id.* at 106 (Trial Tr.).

According to the government, Plaintiff's failure to bring the appropriate equipment to the

mezzanine and his failure to report the unsafe conditions violated  EMCOR's safety policies, *see*

Dkt. 87 at 57 (Trial Tr.) (testimony of Robert Goodwin, Plaintiff's third-level supervisor), and

---

[5]  Not all of these failures, however, contributed to Plaintiff's fall.  For example, although
Plaintiff was not wearing a hard hat at the worksite, it is not clear that donning it would have
averted the fall or prevented his wrist injury.  Plaintiff testified that he fell because he lost his
footing upon hitting his head on conduit.  Dkt. 85 at 66 (Trial Tr.).  A hard hat might have
softened the blow to his head, but it is unlikely that it would have prevented the startled response
that caused him to lose his footing.  Nor would bringing fall protection have prevented the
accident.  As noted above, the mezzanine area of Building 220 did not have any tie-off points, so
Plaintiff would not have been able to use fall protection, even if he had it on his person.

OSHA regulations, *see* Joint Ex. 16 at 24 (Kennedy Expert Rpt.). The expert report of Eugenia

Kennedy, the government's OSHA worksite safety expert, states:

> [I]t does not appear that Mr. Hale understood the safe and proper way to perform the work assignment. Additionally, he did not obtain the necessary tools and materials or report the unsafe work conditions to his supervisor as required by the EMCRO Safety Plan. Mr. Hale did not comply with OSHA regulations. Mr. Hale did not comply with EMCOR's Safety Manual.
>
> Had Mr. Hale recognized the hazards present in this location and taken proper measures in accordance with EMCOR's Safety Plan and OSHA regulations, it is unlikely that this incident would have occurred.

*Id.* (Kennedy Expert Rpt.). Plaintiff's OSHA worksite safety expert, Terry Lane, disputes these

conclusions. According to Lane:

> It is clear from Mr. Hale's deposition that he was in the process of accessing his workplace and assessing the situation when the accident occurred. It is also clear that he was not familiar with this workplace or any of its possible hazards prior to his arrival at the location of his accident. As such, Mr. Hale's conduct was reasonable and did not violate any OSHA standards.

Joint Ex. 3 at 1 (Lane Supp. Expert Rpt.). Plaintiff's supervisor, Luskey, also testified that

Plaintiff was not at fault and the accident could have happened to anyone. Dkt. 78 at 43 (Trial

Tr.).

Based on the Court's review of the evidence, the Court credits the conclusions of

Kennedy over those of Lane and Luskey. To begin, although it is true that Plaintiff was unaware

of the possible hazards *before* entering Building 220, his own testimony establishes that he was

aware of the lack of lighting and barriers shortly after he entered the mezzanine area. In fact,

Plaintiff testified that he could tell that the room was dark—lit only by the ambient light coming

through the mezzanine door—before he even stepped inside. Dkt. 85 at 63 (Trial Tr.). As soon

as he stepped on the plywood path, moreover, he realized that there were no "railings, physical

barriers, or demarcated edges." *Id.* at 65–66 (Trial Tr.). In the face of these known dangers, it

was unreasonable of Plaintiff to continue further into the mezzanine area without at light. The Court finds no merit to Lane's argument that Plaintiff's conduct was reasonable because he was "in the process of accessing his workplace and assessing the situation." Joint Ex. 3 at 1 (Lane Supp. Expert Rpt.). Even if Plaintiff was merely canvassing the mezzanine area, he still acted unreasonably *after* perceiving these dangerous conditions.

At least one of Plaintiff's negligent acts, moreover, substantially contributed to his fall: his failure to carry and to use a flashlight. As noted above, it was unreasonable of Plaintiff to continue searching for the HVAC unit's controls compartment instead of exiting the space to retrieve a flashlight when confronted with poor lighting, lack of guardrails, and a four-foot walkway. Dkt. 85 at 63, 72 (Trial Tr.). A flashlight would have alerted Plaintiff to the hanging conduit, which, in turn, would have likely prevented him from hitting his head and losing his balance. Indeed, Plaintiff's supervisor, Luskey, testified that, the six or seven times he had serviced the HVAC unit in Building 220, he used a flashlight and never had an accident. Dkt. 78 at 26 (Trial Tr.). The fact that Plaintiff left his flashlight at home, Dkt. 77 at 74 (Trial Tr.), moreover, does not excuse or mitigate Plaintiff's negligence. Plaintiff was unfamiliar with the mezzanine area at the time he entered the space; he knew that it was dark; he did not locate a light switch; and he decided to proceed without a flashlight. Plaintiff made a poor decision, and that decision was a substantial factor leading to his fall.

The Court, accordingly, concludes that Plaintiff was contributorily negligent because his failure to use a flashlight was a significant contributing factor to his fall.

## B.    Contributory Negligence Bars Plaintiff's Recovery

The second step of the inquiry—whether contributory negligence bars Plaintiff's recovery—presents a question of law. On one hand, "contributory negligence is, in general, a

complete bar to recovery" under D.C. law.  *Martin*, 395 A.2d at 68.  On the other, there is a "nearly universal rule . . . that neither contributory negligence nor assumption of risk bars recovery for breach of a duty imposed by statute, ordinance, or regulation *if [its] purpose would be defeated by application of either defense*."  *Id.* (emphasis added) (citing Restatement (Second) of Torts, §§ 483, 496F (1965); W. Prosser, Law of Torts 425–26, 458–54 (4th ed. 1971)). Plaintiff's theory of the case is based on the latter principle: He contends that, because the Building 220 worksite violated various OSHA regulations, the Navy was negligent *per se*, rendering any negligence on his part immaterial to his recovery.  Dkt. 90 at 4–9.  The Court is unpersuaded.

In *Martin*, the D.C. Court of Appeals explained that, "where the judicially-developed defenses of contributory negligence and assumption of risk conflict with the purposes of the statutes and regulations [at issue], [those] defenses should not bar recovery."  395 A.2d at 69; *contra Banks v. District of Columbia*, 551 A.2d 1304, 1308 (D.C. 1988) ("[T]he defense of contributory negligence is available as a defense [to housing code violations], since requiring users of leased premises to act reasonably is in no way inconsistent with the policy underlying the housing regulations." (citing *Scoggins v. Jude*, 419 A.2d 999, 1005 (D.C. 1980); *District of Columbia v. Mitchell*, 533 A.2d 629, 643 (D.C. 1987))).  To determine whether the contributory negligence defense is available to a defendant that has violated a statute or regulation, a court must analyze "the effect of [each] statute or regulation" that the plaintiff alleges was violated— that is, "the policies of [its] enactment [and] also the relation of those policies to each of the defenses individually."  *Martin*, 395 A.2d at 69.

Applying this test, the D.C. Court of Appeals held in *Martin* that a violation of sections 11-21090 and 21091(f) of the District of Columbia Safety Standards, Rules, and

Regulations ("D.C. Safety Regulations") precluded the defendant from invoking the contributory negligence defense. *Id.* at 65, 71. The court explained that the "statutory duty of care" imposed by the D.C. Safety Regulations "is broader than its common law counterpart." *Id.* at 70 (citing D.C. Code § 36-432(a) (1973) (repealed) (defining employer as "every person . . . having control or custody of any industrial employment, place of employment, or of any employee")). The court further reasoned that, because the legislative history of the authorizing statute revealed Congress's intent to "impose[] upon employers (as broadly defined) *the sole responsibility* for avoiding [workplace] accidents," Congress could not have intended for contributory negligence to bar claims brought under the statute. *Id.* (emphasis added) (citing H.R. Rep. No. 918 (1941); S. Rep. No. 675 (1941)). Rather, "Congress established a new standard of care which encompasses and supersedes the foreseeable and, practically speaking, inevitable lack of care on the part of wage earners." *Id.* at 71 (citing D.C. Code § 36-431 (1973) (repealed)). In light of the above, the court concluded that contributory negligence could not bar claims based on violations of the D.C. Safety Regulations because the purpose of the "regulations should not be overborne by the common law." *Id.* at 69.

The Court reaches the opposite conclusion here. As a threshold matter, Plaintiff has failed to cite any case—nor is the Court aware of any—that holds a violation of OSHA abrogates the application of contributory negligence under D.C. law. The Court must, accordingly, apply the test from *Martin* to answer this question of first impression.[6] Unlike in *Martin*, the statute at

---

[6] There is a circuit split on a separate, but related, issue: Whether a violation of OSHA gives rise to negligence *per se* in the first place. *Compare Pratico v. Portland Terminal Co.*, 783 F.2d 255, 265–68 (1st Cir. 1985) (holding that an OSHA violation gives rise to negligence *per se* under the Federal Employers Liability Act ("FELA") and eliminates the application of contributory negligence), *and Rabon v. Automatic Fasteners, Inc.*, 672 F.2d 1231, 1238 (5th Cir. 1982) (noting, in dicta, that a violation of an OSHA regulation can, "in appropriate circumstances" be

issue here—OSHA—does not eliminate the application of contributory negligence or alter any

other common law claim or defense.  The text of OSHA is unambiguous in this respect:

> *Nothing in this chapter* [*i.e.*, OSHA] *shall be construed to* supersede or in any
> manner affect any workmen's compensation law or to enlarge or diminish or
> *affect in any other manner the common law* or statutory rights, duties, or
> *liabilities* of employers and employees under any law *with respect to injuries*,
> diseases, or death of employees *arising out of, or in the course of, employment*.

29 U.S.C. § 653(b)(4) (emphasis added).  Holding that contributory negligence does not apply to

claims based on violations of OSHA would contravene the plain language of the statute because

it would remove an affirmative defense otherwise available to employers, indelibly

"affect[ing] . . . the liabilities of employers . . . under [the] law."  *Id.*; *see also United

Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1235–36 (D.C. Cir. 1980)

---

evidence of negligence *per se*), *with Robertson v. Burlington N. R.R. Co.*, 32 F.3d 408, 410–11
(9th Cir. 1994) (disagreeing with *Pratico*); *Ries v. Nat'l R.R. Passenger Corp.*, 960 F.2d 1156,
1161–63 (3d Cir.1992) (same); *and Albrecht v. Baltimore & Ohio R.R. Co.*, 808 F.2d 329, 332–
33 (4th Cir. 1987) (same).

To date, no court has decided whether a violation of OSHA gives rise to negligence *per se* under
D.C. law.  Two D.C. Court of Appeals decisions, however, seem to assume (without deciding)
that it can.  In *Thoma v. Kettler Bros.*, 632 A.2d 725 (D.C. 1993), the D.C. Court of Appeals
"decline[d] to hold that violation of an OSHA regulation is negligence *per se as applied to
injured persons who in no sense are party to the employer-employee relationship* to which the
regulations relate."  *Id.* at 728 (emphasis added) (citations omitted).  Implicit in the court's
holding is the notion that, had the plaintiff been a "party to the employer-employee relationship"
and not a business invitee, *id.*, she may have established a claim for negligence *per se*.  The
second case is *Ceco Corp. v. Coleman*, 441 A.2d 940 (D.C. 1982).  There, the D.C. Court of
Appeals approved a negligence *per se* jury instruction over defense counsel's objection that
"there was no basis for [the instruction] 'on the facts of th[e] case.'"  *Id.* at 946 (citation omitted).
The issue whether a violation of OSHA can give rise to negligence *per se*, however, was not
squarely presented.

The Court need not, however, wade into the circuit split or predict what the D.C. Court Appeals
would hold in a case that raised the question whether OSHA gives rise to an affirmative claim of
negligence *per se*.  For present purposes, it is sufficient to conclude, under the reasoning
employed in *Martin* and the plain language of OSHA, 29 U.S.C. § 653(b)(4), that OSHA does
not "defeat[] the application of" the contributory negligence defense, *Martin*, 395 A.2d at 68.

("[W]hen a worker actually asserts a claim under workmen's compensation law or some other state law, Section 4(b)(4) intends that neither the worker nor the party against whom the claim is made can assert any OSHA regulation or the OSH Act itself preempts any element of the state law."); *Ries v. Nat'l R.R. Passenger Corp.*, 960 F.2d 1156 (3d Cir.1992) ("If a violation of an OSHA regulation could constitute negligence *per se* and bar contributory negligence under the FELA, it would be almost axiomatic that the effect would be to 'enlarge or diminish or affect' the statutory duty or liability of the employer.").

*Martin* turns on the premise that "[s]tatutes and regulations should not be overborne by the common law." 395 A.2d at 69. That is because "[t]he common law was developed to fill the gaps between such non-judicial expressions of policy," and, in the absence of such a gap, judicial "[d]eference to the statutes and regulations is inherent in the separation of the branches of our government." *Id.* Here, however, Congress spoke to the question at hand and declared that nothing in OSHA should be construed to affect "the common law" or the "liabilities of employers . . . with respect to" workplace injuries in any manner. 29 U.S.C. § 653(b)(4). It would stand *Martin* on its head to conclude that the deference that courts owe to congressional enactments requires displacing the contributory negligence defense, when Congress expressly disavowed any intent to, "in any manner[,] . . . affect the common law." *Id.*

Turning to the purpose of OSHA, there is no indication here, as there was in *Martin*, that "[the statute] seek[s] to protect individuals from their own negligence and therefore impose[s] obligations on another party in order to prevent injury." *Mahnke v. Wash. Metro. Area Transit Auth.*, 821 F. Supp. 2d 125, 138 (D.D.C. 2011); *see also Jarrett v. Woodward Bros.*, 751 A.2d 972, 985 (D.C. 2000) (holding that contributory negligence is not a defense to a violation of the D.C. statute prohibiting the sale of alcohol to minors). To be sure, the purpose of OSHA is to

promote workplace safety.  *See Ries*, 960 F.2d at 1160.  But, unlike the D.C. Safety Regulations at issue in *Martin*, which imposed "the *sole* responsibility for avoiding those accidents" on employers, 395 A.2d at 70 (emphasis added), OSHA does not "hold the employer responsible for the prevention of all accidents," *Usery v. Kennecott Copper Corp.*, 577 F.2d 1113, 1118 (10th Cir. 1977).  To the contrary, the regulations impose a concomitant duty on employees to avoid accidents by complying with OSHA regulations.  *See* 29 U.S.C. § 654(b) ("Each employee shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to this [Act] which are applicable to his own actions and conduct.").  Given that OSHA was "not enacted with the purpose to protect [workers] from their own negligence, a contributory negligence defense would not frustrate or conflict with the underlying purpose of the [statute] and remains available to the defendant." *Mahnke*, 821 F. Supp. 2d at 140 (holding that the defendant's violation of a traffic regulation does not bar the contributory negligence defense because, under D.C. law, both drivers and pedestrians have "a duty 'to keep a proper lookout'" (citations omitted)).  There is, accordingly, nothing in either the text or purpose of OSHA that would suggest Congress intended a violation of OSHA regulations to bar the application of contributory negligence.

The Court therefore concludes that, under D.C. law, a violation of OSHA does not eliminate the application of contributory negligence as a bar to recovery.

## CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff is barred from recovery because he was contributorily negligent.  The Court will, however, defer the entry of judgment, pending a joint status report from the parties informing the Court how they would like to proceed regarding the settlement issue.

It is hereby **ORDERED** that the parties shall file a joint status report on or before August 23, 2019.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  August 9, 2019